2012-2007 We'll be ready when you are, Ms. Jean Kaplan. May it please the Court, my name is Sylvia Jean Kaplan and I represent the Petitioner as a volunteer. The issue before this Court is whether the claimed Court committed legal error when it accorded deference to the Special Master's findings and facts, despite acknowledging that the Special Master never conducted a complete analysis of whether the Petitioner's injury was caused by the flu vaccine pursuant to the ALPIN standard. But wasn't your theory of the case that she had autonomic neuropathy, and wasn't the fact-finding that that was improved? And so doesn't that vitiate the whole need for going through point-by-point the ALPIN analysis? Your Honor, the fact-finding was based on the fact that the Special Master believed that she did not have autonomic neuropathy. However, the ALPIN standard requires that the Petitioner first determine whether there is a plausible theory about how flu vaccine can lead to the development of autonomic neuropathy, whether the patient had autonomic neuropathy, and whether the temporal relationship was appropriate. And this Court has indicated that in situations where each prong does not have preponderant proof, one prong can lead support to another prong to provide that preponderant proof. Well, sure. But to get back to Judge Lurie's question, my understanding of ALPIN is that the theory that you put forward—you don't have to show all the mechanisms. I mean, scientific medicine is a very imprecise science at this point, and we don't know exactly how everything works. But we do know that certain things lead to other things with fair predictability. And my understanding was that both your theory in this case and the requirement for ALPIN is that you show a theory as to how the vaccine could ultimately cause the condition. And here, that theory was the vaccine caused autonomic neuropathy, which manifested as dysautonomia. Now, if you don't prove that there's autonomic neuropathy, how do you sustain your claim that the dysautonomia was attributable to the vaccine? Your Honor, in this particular instance, after the first day of hearing, it was acknowledged that the petitioner had dysautonomia. Sure. No one doubts that. No one doubts that, Your Honor. In the midst of the second day of hearing, the respondent agreed with the petitioner's expert that she has POTS. And he also agreed that POTS is a limited form of autonomic neuropathy. And he indicated that in the article, one of the articles that was filed, only 50% of the patients with POTS had autonomic neuropathy. The other 50% did not. And in the denial of entitlement to our petitioner, he cited the fact that the petitioner had not established that. She was not in that 50% who did not have autonomic neuropathy. And the petitioner's position is that that's not her burden. Her burden is to establish by preponderant evidence that she did have this condition. This condition being autonomic neuropathy. Autonomic neuropathy, Your Honor. Right. Okay. So we're all on the same page here. She has to show that she had autonomic neuropathy. We are, Your Honor. Okay. That is correct. All right. So as I understand, your legal argument is that if you don't take everything into consideration, for instance, the temporal relationship, then you can't make that determination with respect to Step 2 of all things? Your Honor, the Special Master actually made a finding that the respondent did agree that the temporal relationship was appropriate. But we would agree that the statute indicates that the decision is based on the record as a whole by preponderant evidence. And case law here is actually quite instructive. This court in Andreu indicated that while no party is required to submit epidemiology in support of their claim, when epidemiology is submitted, it must be considered. And in this particular case, the petitioner was the only one who filed an epidemiological study in support of her claim. And it was the largest article, the largest case series of POPS patients that was... This was the Mayo Clinic? This was the Mayo Clinic. This even article, Your Honor. There are actually two Mayo Clinic articles, and they are actually quite supportive of the petitioner's claim. But are you saying that the Special Master didn't consider certain evidence, or the Special Master just was wrong when he considered the evidence? Which one are you saying? He considered the evidence, and he did not consider the totality of the evidence, which is what he's just required to do because it is the record on which preponderant findings are made. And in this even article, Your Honors, it indicated that at least half of POPS patients are limited forms of autonomic neuropathy. And to ensure that they had pure POPS patients, they had an exclusion requirement that indicated that if the person's blood pressure dropped within three minutes of standing or a tilt table, then they were excluded from the study because they were not a pure POPS patient. And in this particular case, Special Master denied in POPS the claim based on the fact that because the petitioner's blood pressure did not drop, that she did not have autonomic neuropathy. Now, this study indicates that that is not the situation in POPS patients. Their heart races, but their blood pressure stays stable for a relatively long period of time. And the respondents themselves submitted an article which supports that as well. I think everybody agrees. Maybe I'm wrong about this, and the Respondent's Council can tell me if I am, but I have the impression that not only does everybody agree that she suffers from dysautonomia, but also that she has all the symptoms of POPS. The question is, is she in that portion of the POPS population that has autonomic neuropathy, or is she in the other 50 percent? That was what I understood the Special Master to be trying to decide in this case, and he concluded that she had not proved that she was in the autonomic neuropathy half. You're right, Your Honor. However, when looking at the evidence, the Thevenin article doesn't support that finding. In what respect do you mean it doesn't support the finding? The Thevenin article, the Special Master indicated that one of the reasons for denial of the claim was the fact that there was no other objective test data to support that she had autonomic neuropathy. The Thevenin article demonstrates that in 90.8 percent of the patients in this study population, they had only mild autonomic neuropathy, and that most of them did not have objective findings of autonomic neuropathy on testing. Now, the Mayo Clinic has also developed a scoring on the types of autonomic testing that's conducted to make the diagnosis, to assist in making that diagnosis. There are three essential tests. One tests the nerve that's applied to the heart. Another one tests the nerves that supply the blood vessels. And the third one is essentially a sweat test. And based on those findings, a physician can determine where within the autonomic nervous system the person's deficit arises from. Now, in this particular case, there were two tilt table tests performed by two separate physicians. Both tilt table tests were abnormal, and both tilt table tests indicated that she had a mild autonomic neuropathy. She had POTS, which they indicated was reflective of a mild autonomic neuropathy. So, as I understand that article, and maybe I'm doing the math wrong, but so the article specifically says that 50 percent of the POTS patients, a full 50 percent, had autonomic neuropathy. But 90 percent of the total population, or 98 percent of the total population, did not have positive results on the very objective tests that the special master insisted, so that obviously some portion of that 50 percent had to have not had objective tests, even though everyone agreed that they had autonomic neuropathy. Correct? The scoring is based on 1 to 10, Your Honor. And 1 to 3 is an indication of mild autonomic neuropathy. The CAS scoring, is that what you're referring to? The CAS scoring, yes, which represents the composite autonomic severity score. And needless to say, zero means no autonomic neuropathy, and 10 means severe. In this particular study, what they demonstrated that more than 50 percent, 90.8 percent of these patients had mild autonomic neuropathy based on essentially what they call an adrenergic stimulation test, which is essentially the tilt table test, which looks at the nerves providing innervation to the blood vessels in the legs. And there's no dispute among the parties that POTS is caused by adrenergic innervation of the vessels in the legs that supply blood to the heart. To make sure I understand this now, is the tilt table test indicative of POTS, or is it indicative of POTS with autonomic neuropathy? It is indicative of POTS. Right, but not necessarily POTS with autonomic neuropathy, as I understand. Is that correct? The presumption is that it is an autonomic neuropathy. And what's the basis for that presumption? There is actually an early article by Dr. Suarez, also out of the Mayo Clinic, and it was a 1994 article in which it looked at idiopathic autonomic neuropathy. And in it, it indicated that it does not have to be a complete failure of the autonomic nervous system, which means a pan-disautonomic. But there can be a focal defect in either the sympathetic or the parasympathetic. It can be mixed, or they could have pan-disautonomic. So it is a spectrum disorder, just as GBS is a spectrum disorder.  And in this Suarez article, it indicated that the focal autonomic findings is on a spectrum with autonomic neuropathy. And your argument is that she had focal autonomic neuropathy, I take it. Non-peripheral, I think, is the way Dr. Morgan put it. What was his statement, I guess? A case of autonomic neuropathy without peripheral involvement. I believe that his autonomic neuropathy after ganglion is peripheral neuropathy. Right, but he said that wasn't her case. I believe when he said without peripheral neuropathy, he meant the motor and the sensory that one normally sees in Guillain-Barre syndrome. So he didn't really mean peripheral involvement. Did he misspeak? Because if he did, I spent a lot of time worrying over that. No, Your Honor, you have not misspoken. I think it's... The question is, did he? I mean, in quoting him... Well, I'm looking for your medical expertise here, and to the extent that it's referenced in the record. What, A, what does he mean when he says a case of autonomic neuropathy without peripheral involvement, and B, to what extent is the autonomic nervous system a subset of the peripheral nervous system, or vice versa? Because I've been doing a little poking around trying to figure this out. I found there to be conflicting indications in the literature. Autonomic neuropathy is a form of peripheral neuropathy. It's a form of peripheral neuropathy. So when you say autonomic neuropathy without peripheral involvement, you're not saying autonomic neuropathy that is not a type of peripheral neuropathy? The classic form of peripheral neuropathy involves motor and sensory, and it generally is situations such as Guillain-Barre syndrome, where you have both motor and sensory problems, but in the vast majority of patients with Guillain-Barre syndrome, I believe Dr. Child, who responded to this, indicated that 79% of them also have an autonomic neuropathy. Okay, but going back to Dr. Morgan, when he says this is a case of autonomic neuropathy without peripheral involvement, what exactly does he mean by that? My understanding of that, Your Honor, is that he's indicating that the person's not paralyzed, and he has no numbness and tingling, which is the motor and sensory complaint that you normally see in Guillain-Barre syndrome. She has a peripheral neuropathy involving only the autonomic nervous system. And that was my understanding of that, Your Honor. I see. So Mobley also provides guidance here. In Mobley, the court indicated that there has to be some condition of reliability for a court to accept the testimony. And in this particular instance, where respondents, experts, indicated that to have autonomic neuropathy, one must have a drop in the blood pressure, is contradicted by the deviant article and by an article which they submitted. And also the fact that in the absence of more positive test results, that this is an indication that she did not have autonomic neuropathy, which is also contradicted by the deviant article. I was trying to sort through the testimony. According to the study, about 50% of the POTS patients have autonomic neuropathy, and then POTS can also be caused by just a few other, as I understand it, conditions. Several of which were discounted as it relates to her. So what was left? I mean, I understand that Dr. Charnley said he had no idea what caused it, but we know certain things didn't, correct? Correct, Your Honor. So what other things can cause POTS? In the testimony, all conditions that could possibly cause POTS were ruled out except for immune-mediated autonomic neuropathy and what he called idiopathic. Now, the respondent's expert hinted that she could potentially have a mitochondrial disorder which could contribute to the development of POTS. But then he rapidly admitted that while he submitted the article, he was not saying that she had a mitochondrial disorder. He was saying that it was merely possible. Now, if the proper analysis... He did back off and say there wasn't really much evidence on that point. But he did assign that it could be something else. Correct. So that left it. She did have a workup for mitochondrial disorder, and it was negative. She had some pre-vaccination symptoms, at least arguably. The May incident, which she recovered from in a couple of months, I think she said, and by a couple of months later she felt back to her old self. But that was an incident which would be consistent, I take it, with an earlier POTS condition, right? Not necessarily indicative, but consistent. It would be consistent with a dysfunction in the autonomic nervous system, which is not necessarily an autonomic neuropathy. If she had an autonomic neuropathy, the symptoms would persist as they do currently. And in that particular case, she recovered. Granted, it took almost a month for her to recover, but there was a full recovery. And she was completely asymptomatic when she received her immunization. And within the appropriate timeframe, she developed symptoms of an autonomic neuropathy. Ms. Trent-Kaplan, you wanted to say one minute? You can run over, but we'll give you your one minute back. Thank you, Your Honor. Mr. McLeod? Yes, Your Honor. May it please the Court, my name is Glenn McLeod. I represent the respondent, Secretary of Health and Human Services, on this appeal. This case focuses upon a failure of proof. The special master in the case analyzed all the evidence. The medical testimony and the testing that was done in this case. And he was posed with a finding of fact. That is, whether or not the petitioner's alleged logical sequence of cause and effect between vaccination and injury was persuasive. Now, it's in particular of notice that you're correct. The government does not contest whether there's dysautonomia in this case. The government does not contest whether there is POTS. The question is whether the petitioner suffered from an autonomic neuropathy. And whether the preponderance of the evidence supports a finding of that injury. One of the things that I have a problem with is that this case I see as very different from Breckelstein, where the special master was faced with two different diagnoses from two different experts, both of which had some support in the record. And the real question was, could the special master choose between those diagnoses? Here we have all the medical records to the extent that they hint at any diagnosis, hint at one. There's an expert that says that's what it is. And the alternative expert simply says, I have no clue what it is, but I don't think it's that. Isn't that very different? I mean, rather than having two clear possible bases for diagnoses that the special master chooses between, here the special master is supposed to be applying only preponderance standards. It doesn't have those alternative diagnoses. Well, the alternative diagnosis in this case is the alleged injury of autonomic neuropathy. That was a claim of a petitioner's expert that this petitioner suffered a specific injury, autonomic neuropathy, and in a specific area of her autonomic nervous system.  Now, Your Honor points out the medical records seem to indicate in several instances that there was an autonomic neuropathy. Both the special master and the Court of Federal Claims on Review, however, demonstrate that the record is not consistent with that diagnosis. That is, the question of whether the petitioner actually suffered the injury for which she seeks compensation, namely an autonomic neuropathy, exists in the record, is a fundamental fact that must be resolved by the special master, like any other fact in a case. Well, what is the strongest piece of evidence relied upon by the special master that points away from autonomic neuropathy in this case? The strongest piece of evidence is the fact that despite all the numerous testing that the petitioner underwent for her autonomic nervous system, this is demonstrated in Respondent's Exhibit H, which can be found page A193 of the record, were normal. I say that, but I move on then to say that taking that piece of evidence in isolation really would be a disservice to the special master because he didn't just consider that piece of evidence. He considered not only the test results, which were normal, but also the symptomatology that the petitioner did not exhibit, which the expert testimony, from Dr. Chaudry in particular, indicated that someone with autonomic neuropathy would likely also exhibit. But what about the fact that in the Mayo Study, the Mayo Study begins with the proposition that objective tests for these conditions are very difficult and rarely determinative, and that they have a population which they say is at minimum of 50% has neuropathy, autonomic neuropathy, but some 85 to 90% of those people don't score positively on these very cast tests that he felt were so determinative. So we're talking about preponderance. There's a huge percentage of the population that everyone agrees has autonomic neuropathy who wouldn't score positively on these tests. This just goes to show you, Your Honor, that the determination of whether there is an autonomic neuropathy is not just a check-the-box situation. It involves not only testing, but also subjective analysis of the testing and looking at the totality of the injured claimant. In response specifically to your question, while it may be true, and respond doesn't concede this, but even if it were true that 98% or whatever percentage the claimant petitioner's counsel asserts had no significant signs of objective testing, yet the results of that study still concluded, and this is undisputed, that upwards of half of the claimants did not have autonomic neuropathy. So the question still is, despite the fact that this article is in the record, did the special master... It was not upwards of half. Half. Half. And given the other conditions that can cause POTS, several of which were discounted in her circumstance, there's a burden here, and the question is, did she get over 50% or not? Right, and the special master in this case looked at not only that article, but also the testing done by the treating physician and the conclusions of the treating physicians of those test results. Dr. Freeman in particular, a treating physician who is not only a treating physician, he's demonstrated in the record to be one of the leading experts in autonomic dysfunction. Let's assume, let's try to strip this case down to the bare essentials and assume with me that you have a condition that you start off with 50% of the people that have this condition, it's caused by the vaccine. Let's just assume that. The other 50% do not. Your claimant has the condition. There's no doubt about it. And she comes in and she proves that she doesn't have any of the conditions that are alternative, or she doesn't have any of the alternative causes for the complained of condition that would make up 45% of the 50%. She isn't able to prove that she doesn't have that 0.5% that's left over. Does she win her case by showing that she's either in the 50% for sure, but she's in the 50% because she's not in the 45% and that leaves her with a 50 versus 5 percentage likelihood that she has the condition because of the vaccine? The petitioner's burden would have to be by preponderance of the evidence and that indicates that if the evidence is just 50% No, she's got 50% and then she excludes 45% of the remaining 50. Does that give her a preponderance of proof legally and entitle her to recovery? I don't think so. I think that's a question of fact for the finder of fact to conclude whether or not I've stripped away all the other facts. Those are the only facts. There's a 10 to 1 chance statistically that she got this condition from the vaccine. Does she win her case? Under those circumstances, we'd have to concede that she would. I mean, if the evidence is so overwhelming that a finder of fact would do that. But that's not the facts of this case. Going back, what are the indications... Let me ask the question this way. Are there any test indications on Exhibit H that would be counter-indicative of an autonomic neuropathy? Given the difficulty of demonstrating autonomic neuropathy through testing. None of the tests on this Exhibit H exclude the possibility of an autonomic neuropathy. The question is whether the preponderance of the evidence in this case, including not only these test results, but the treating physician's analysis, the expert's testimony, the medical literature, the medical records, whether the entire record weighs in the preponderance of whether the petitioner demonstrated she does in fact suffer from an autonomic neuropathy. Now, would you... Go ahead. I was going to say, on the other hand, as I was saying, although no one single test might exclude an autonomic neuropathy, we have numerous test opportunities to objectively test dysfunction in the autonomic nervous system. And the testimony in this case is it's highly unlikely that you would receive these normal tests, despite the Mayo Clinic article, because the Mayo Clinic article still concluded that upwards of 50% of those individuals did not suffer autonomic neuropathy. Would you agree that postural hypertension would be indicative of autonomic neuropathy? It could be. On the tilt table test? It could be. The tilt table test was abnormal, as demonstrated in Exhibit H, but the treating physicians described that as a nonspecific finding. Nonspecific meaning it doesn't specifically point to autonomic neuropathy. It could be consistent with it, but it's not diagnostic. Now, there were... I was going to ask you, this is getting really specific, but there may be an explanation for this. I noticed that the postural hypertension references do not include one of the tests, I think, that was run. That's... I think it's Physicians' Exhibit 7, page 3, is that right? That's on 839. That doesn't look like it was included in that list. That was one of the ones in which the test was terminated because she felt that there was exaggerated tachycardia and significant blood pressure fall. You see that in the middle of paragraph number 4. That doesn't seem to be referenced in Exhibit H. Exhibit H, the bottom of page, very last entry, tilt table for orthostatic tachycardia. Oh, I see. So that was included down there and not in the blood pressure, postural hypertension. It was separately done as a tilt table? Yes, Your Honor. But there's two different ways to test for the same thing, correct? Correct. Are you familiar with the concept of differential diagnosis? Yes, Your Honor. One of the things to do is to try to rule out other possible causes of a problem. Another thing is to look at the environmental possibilities with respect to causes. So by not considering the temporal relationship as part of the overall Olson analysis, what the special master effectively did was ignore the fact that if you put the differential diagnosis in its totality on the record, you would have a temporal factor that could cause autonomic neuropathy. Then you have the symptoms that relate to autonomic neuropathy, and you have three or four other conditions that have been discounted. And when you look at that totality, why doesn't that indicate by a preponderant level of proof that it's more likely than not that she has autonomic neuropathy? First of all, I think in the differential diagnosis aspect, none of the treating physicians in this case listed all of the potential, that I'm aware of, from the record, list all the potential causes of autonomic neuropathy. Few are listed by Dr. Freeman. I think he lists mitral valve prolapse, which is discussed in the record of Petitioner. He lists drug-induced. But also the drug-induced, which was not discounted, I believe. Is there any evidence that this is drug-induced? No, not drug-induced, but the medication that she was on, I believe, was one of the medications that could have contributed to the POTS condition that she had. Did any physician opine that that was the likely cause of it? No physician opined at all that it was the likely cause of her POTS, regardless of, they listed potentials, but as this record is replete, no treating physician or group of treating physicians was able to come up with an understanding of Petitioner's constellation of symptoms. They focused on POTS, but when they probed down and tried to determine specifically whether she suffered from autonomic neuropathy, the leading expert in the field was unable to conclude that she, in fact, had autonomic features in her illness. And the special master found that persuasive. He found that fact important. The question is whether it's wholly implausible for the special master, when he looked at all of these facts, to conclude that more likely than not, Petitioner did not suffer from autonomic neuropathy. Isn't it also your view that we shouldn't be weighing facts? Yes, Your Honor. This is a fact-driven determination. Petitioner is attempting to argue that the special master misinterpreted the facts, misweighed the evidence, and this Court has said in previous decisions repeatedly that questions of fact and credibility and determination, unless they're wholly unbelievable or are irrational and based on the record, are subject to an arbitrary and capricious standard of review. And the Court of Federal Claims, on review, concluded that the special master's evaluation was not arbitrary and capricious. Whether another fact finder could have evaluated this record and come up with a conclusion by preponderance is not the question. The question is whether this special master, on the totality of the record before him, erred and was arbitrary and capricious in his factual determination. The rest of Petitioner's case falls based on the lack of autonomic neuropathy. And there's also significant evidence in this case that this condition predated the vaccination. Well, there's the one piece of evidence that I think, in my exchange with Ms. Chintapp, let me discuss what else. Well, you're on with the May incident, which you're referring to. Also, Dr. Chaudhry, in his testimony, listed that if you accept what Dr. Morgan was saying was symptomatic of her dysautonomia condition, the flushing, the dizziness, that there are symptoms throughout this record as early as 2002 in which the Petitioner was complaining of these symptoms. It wasn't a situation where the Petitioner was completely healthy until her vaccination and then all of a sudden started to experience dysautonomic symptoms. This record is replete with evidence of dysautonomic symptoms. And to correct, I see that my time is up, but to correct one statement of the Petitioner, the government did not concede that the onset of this condition, to the extent the Petitioner is asserting that, meets the third prong of all of them. Dr. Chaudhry merely stated that if one were to assume that there was an autoimmune-mediated illness, that it would take up to eight days or so to manifest. But it does not say the same that we agree that her dysautonomia had its onset within that period of time. Thank you, Mr. McCloud. Thank you. Ms. Jen Kaplan, we'll give you one minute. And since one minute passes so fast, we'll give you two minutes. Okay, Your Honor. I'll try to talk very quickly. With respect to the logical sequence of cause and effect, this court has historically looked at the treating records of the treating physicians. And in Petitioner's reply brief on page six, we've listed a small summary of the treating physicians who indicated that she had autonomic neuropathy. There are others, but we did not list them all. And the very first one was by Dr. Kaplan, in which she said, I think she had a post-infectious neuropathy with autonomic features. This would be a kind of Guillain-Barre with partial dysautonomia. And this was in June of 2004. She then goes for the first toe-table test, and at the first toe-table test... But Guillain-Barre is peripheral, right? So Dr. Morgan walks away from that. She doesn't have typical Guillain-Barre. We would agree with that. She does not have the sensory and the motor findings that one sees in Guillain-Barre. Right. First toe-table test supported a finding of autonomic neuropathy. And the treating physician at that time indicated that we will aggressively treat her to determine whether it's related to dehydration or not. She was aggressively treated. Her symptoms persisted. She then goes and sees Dr. Gorson, who is affiliated with Tufts Medical School, and what he says is, it is certainly possible that she developed a modest dysautonomic neuropathy following a nonspecific viral illness or even the flu vaccination back in November. And then further, we have Dr. Novak, who after evaluating her physically, conducted history and physical, conducted a second toe-table test. And the second toe-table test was not addressed by the special master in the least bit. But the second toe-table test confirmed the finding of a mild autonomic neuropathy. In science and medicine, when you have replication of the result, the results are valid. And in it... Which toe-table test was that again? This is toe-table test number two, Your Honor. And that's on what page of the... I have it as... Excuse me. I have it as... Two non-normal toe-table tests, right? A55 and 39. I have A55 as the second toe-table test. That's the one you're referring to? That's the one I'm referring to. Now, that was referenced, I think, in Exhibit H. In Exhibit H? Right. That was Dr. Chaudhry's exhibit, and that is the reported drop in blood pressure exhibit. It was Exhibit 19 before the special master, page 6. I believe he referred to Dr. Freeman's and not Dr. Novak's. My recollection is that he only referred to one toe-table test, and that was the one that was done at the Israel Hospital. Well, he's... I don't want to take up all your time on this, because it's a small point, but I would like to get the toe-table test down, because that's one of the few hard pieces of evidence we've got. If you look at A193, at the top, that's Exhibit H, the postural hypotension, referenced both there as the number 4, reported drop in blood pressure, Exhibit 19, page 6, and also abnormal for orthostatic tachycardia, which is a toe-table test, but talking about the heart issue. That's also Exhibit 19, page 6. Exhibit 19, page 6, appears to be the exhibit that's at A55, if you look at the bottom right corner. Your Honor, in our reply brief, the first toe-table test is at A39. 39, that's the other one. And the second toe-table test is at A55. Right, but 55 is the one that's referenced twice in Exhibit H, right? So you're saying that Dr. Chodry didn't allude to one of the toe-table tests. That's correct, Your Honor. But he does appear to allude to the one that's referenced on A55. Are you saying he didn't allude to the one at A39? It was my understanding that he was referencing A39 and not A55. Well, but A55 says Petitioner's Exhibit 19, page 6, right? Mm-hmm. And down at the bottom, at postural hypotension, it says Exhibit 19, page 6, on page A193. Do you see that? I do, Your Honor. And I'm afraid I do not have those exhibits with me, so I cannot answer your question. But I can tell you that there were two toe-table tests performed. They are contained in the record, in the appendix. Both toe-table tests are abnormal. It's my recollection that only one toe-table test was referenced by Dr. Chodry and the Special Master, and that was the one by Dr. Freeman, the very first toe-table test. Now, with reference to the on-and-off norm, she goes to C, on-and-off discretion. Ms. Chin, we've given you a lot of extra time. Do you have one further sentence to conclude with? One further sentence. This is not a situation where there is absolute discretion based on finest facts. There was an error of law made. And when an error of law is made, this Court can look at the evidence being held. Thank you. Thank you. We will take the case on submission. I compliment both counsel and the defense for the case. As mentioned, we will break.